This action was brought by the plaintiff to recover the price of fertilizer goods sold and delivered by the plaintiff to the defendant in March, 1919, under a contract previously made.
The defendant admitted in his answer that he made the contract, and that "Exhibit A" attached to the complaint is a true copy thereof.
The plaintiff alleged that it delivered to defendant, under the terms of said contract, fertilizer to the value of $2,547.46, nearly all of the *Page 275 
fertilizers being bone and Peruvian C. S. M. (cotton seed meal), 8-2-2 goods — that is to say, the guaranteed analysis appearing on the bags was 8 per cent available phosphoric acid, 2 per cent ammonia (equivalent to 1.65 per cent nitrogen), and 2 per cent potash.
The defendant admitted in his answer that the plaintiff delivered the quantities set out in the exhibit attached to the complaint, but denied that the goods delivered were according to contract, and alleged that they were worthless and contained borax and other harmful ingredients, and denied that he owed the plaintiff anything, admitting, however, that he had paid plaintiff nothing.
Defendant then set up a cause of action or counterclaim for damages for results from use, alleging that the plaintiff wrongfully and fraudulently included borax and other harmful ingredients in the fertilizers sold and delivered to him, and that he used a part of them on his crops of corn, cotton, and tobacco, and that he was damaged thereby $1,500.
The plaintiff replied to the counterclaim and denied the allegations of the answer as to the presence of borax or other harmful ingredients, and for further reply alleged: "That samples were drawn from said fertilizers sold and delivered by plaintiff to the defendant, and known as `American Bone and Peruvian C. S. M.,' and which defendant claims had done the damage to his crops, and said samples were submitted to the State Chemist for analysis as provided by law, and were duly analyzed by him, at the request of the defendant, a copy of said certificate of analysis by the State Chemist being attached; and as appears therefrom the result of the analysis was that the value of the guaranteed ingredients was equivalent to $38.05 per ton, whereas the ingredients found by analysis were equivalent to $39.20 per ton, and that said analysis showed no borax or other deleterious substances, and the plaintiff is advised that a copy of said analysis was furnished to the defendant, and that at the request of defendant the State Chemist made a special analysis with a view to ascertain whether said fertilizer contained borax as claimed by the defendant, and that the State Chemist, under date of 15 July, 1919, wrote to the defendant as follows: `We have made examination of the sample of fertilizers, the American Bone and Peruvian Cottonseed Meal, manufactured by American Fertilizing Company of Norfolk, our number 4211, sent in by you, for borax and do not find borax to be present.'"
The plaintiff also pleaded as a bar to recovery by the defendant of any damages the written contract between the parties, and especially paragraph 10 thereof, and the provisions of ch. 143, Public Laws 1917, as amended by ch. 120, Public Laws 1919. These acts are brought forward as sections 4690 to 4703 of Consolidated Statutes. *Page 276 
The plaintiff offered in evidence the contract between the parties, being "Exhibit A" attached to the complaint, which is as follows:
"It is further agreed that all deliveries under this contract are made with guaranty only of analysis on the sack, and not of results from use of said fertilizers or otherwise; and before using these fertilizers samples should be drawn and submitted to the State Chemist (or other authorized State official) for analysis as provided by the law of the customer's State, and if any claim shall be made for inferiority or deficient analysis, the certificate of analysis by the State Chemist (or other authorized State official) or his oral evidence shall be the best and only competent evidence of the contents of the goods, and shall be conclusive. If it shall appear from the said certificate or test that the goods do not come up to the guaranteed analysis, then the customer shall be entitled to recover the difference between the contract price and the actual value of the goods, as shown by the analysis made as above provided, which difference shall be ascertained, fixed and determined by the State Chemist (or other authorized State official); and no other damage shall be recoverable for deficient analysis or inferiority; provided, if damages for defective analysis or inferiority shall have been, or shall be assessed and paid as provided under State statute, then no other or further damage shall be collectible under the contract. A failure to draw this sample and submit it to the State Chemist (or other authorized State official), as above provided, shall be a full waiver on the customer's part of any claim for deficient analysis or inferiority hereunder. As soon as these fertilizers are received the customer shall examine them, and in case of any shortage in weight or count, error in tagging or other objection to the goods, the customer shall notify the company within ten days, giving the company opportunity to make inspection and correction before the fertilizers are used, otherwise any claim for damage under this analysis, as above stated, is hereby waived; and it is further agreed that the company shall not be liable for or required to make good to the customer any deficiency or claim for deficiency made or presented by any person purchasing from the customer."
The plaintiff next offered in evidence a verified itemized account of the goods sold and delivered, and also offered in evidence the certificate of analysis by the State Chemist, attested by the seal of the Department of Agriculture, of a sample of the fertilizers drawn from the lot in the hands of the defendant, which is as follows:
The official sealed sample of fertilizer received from the Commissioner of Agriculture has been analyzed, with the results as stated below:
The fertilizer proves to be: Name — American Bone and Peruvian C. S. M. *Page 277 
Manufactured by American Fertilizer Company. Address, Norfolk, Virginia.
Drawn from lot in hands of D. J. Thomas, Carthage, N.C. (R. F. D. No. 2).
The guaranteed percentage appearing on bags are: Available Phosphoric Acid, 8 per cent; Nitrogen, 1.65 per cent; Potash, 2 per. cent.
Result of Analysis
Available Phosphoric Acid, 8.80 (including Soluble and Reverted Phosphoric Acid).
Nitrogen, 1.65.
Potash, Actual K. O. Soluble in Water, 1.96.
Note. — Does not contain Borax.
The relative value of the guaranteed ingredients at the factory per ton of two thousand pounds is equivalent to $38.05. The relative value of the ingredients found by analysis, per ton of two thousand pounds, is equivalent to $39.20, using in each case the following figures: Available Phosphoric Acid, 7 cents per lb.; Nitrogen, 45 cents per lb.; and Potash, 30 cents per lb. These figures are based on the wholesale prices of the fertilizers or fertilizer materials (bagged) at factory.
The guaranteed percentages were: available phosphoric acid, 8; nitrogen, 1.65 per cent (equivalent 2 per cent ammonia); 2 per cent potash. The analysis showed available phosphoric acid, 8.80; nitrogen, 1.65; potash, 1.96. No borax. The value of the guaranteed ingredients was equivalent to $38.05, while the value of ingredients found by analysis was $39.20. These figures are based on the wholesale prices of the materials at factory, as required by C. S., 4695. In other words, the fertilizers delivered had $1.15 in value of plant food per ton more than the goods contracted for, and yet the defendant alleged the goods were worthless. The acid phosphate was above the guarantee 80 per cent; the nitrogen or ammonia was just in accordance with the guarantee, while the potash was .04 per cent below the guarantee. Experience has shown that it is impossible in mixing fertilizer materials always to have the ingredients in exactly the guaranteed percentages, and the statute provides that if the deficiency is five per cent below the guaranteed value in plant food the manufacturer is penalized, and it is further provided that "Any excess of any ingredient above the guarantee shall not be credited to the deficiency of any other ingredient if the deficiency is more than 15 per cent." C.S., 4695. The deficiency of potash was much less than 15 per cent; in fact only 2 per cent. At the time the sample was drawn from these 8-2-2 goods in the hands of the defendant he was claiming that they contained borax, and the *Page 278 
analysis was made at the request of the defendant for the purpose of ascertaining whether borax was in fact present, as the defendant claimed, and this accounts for the following notation on the analysis: "Does not contain borax."
All of the evidence which the defendant offered at the trial was for the purpose of showing that these 8-2-2 goods, from which the sample had been drawn and analyzed, did contain borax. The defendant himself testified that he had used these 8-2-2 goods, purchased from the plaintiff, on his crops of corn, cotton, and tobacco, and then he offered to show that he made poor crops, and how the plants were affected. This was excluded. The defendant next proposed to show by a number of his neighbors, who had purchased from him the 8-2-2 goods of plaintiff, and who had used this fertilizer on their crops, that they made poor crops. This was excluded. The defendant next propounded to Professor Wolf, a botanist connected with the Experiment Station, a hypothetical question purporting to be based upon the excluded testimony, as to the condition of the crops where the 8-2-2 goods were used, and asked him, if the jury should find the facts to be as set forth, whether he had an opinion satisfactory to himself as to what caused this condition of the plants. The witness would have answered that these conditions were the symptoms of injury by borax. This is all the evidence the defendant offered.
It thus appears that all of the proffered testimony on the part of the defendant was directed to showing that the 8-2-2 goods contained borax. These were the goods the plaintiff sold the defendant, and which the defendant had caused to be officially analyzed by the State Chemist for the express purpose of determining whether they did, in fact, contain borax, and this analysis showed that the goods did not contain borax. The court excluded this proposed testimony in view of the statute applicable and the admitted contract between the parties and the decided cases. The statute provides as follows: "The Department of Agriculture shall have the power, at all times and at all places, to have collected by its inspector samples of any commercial fertilizer or fertilizer material offered for sale in the State, and have the same analyzed; and such samples shall be taken from at least 10 per cent of the lot from which they may be selected: Provided, that no sample shall be drawn from less than ten bags of any one brand." The statute then provides in detail for the drawing of samples, and concludes as follows: "In the trial of any suit or action wherein there is called in question the value or composition of any fertilizer, a certificate signed by the State Chemist and attested with the seal of the Department of Agriculture, setting forth the analysis made by the State Chemist of any sample of said fertilizer drawn under the provisions of this article, and analyzed by *Page 279 
him under the provisions of the same, shall be prima facie proof that the fertilizer was of the value and constituency shown by his said analysis; and the said certificate of the State Chemist shall be admissible in evidence to the same extent as if it were his deposition taken in said action in the manner prescribed by law for the taking of depositions. The department shall refuse to analyze any sample of commercial fertilizer that is not drawn and forwarded to the Department of Agriculture in accordance with the regulations which it may adopt for the carrying out of this article: Provided, that no suit for damages from results of use of fertilizer may be brought except after chemical analysis showing deficiency of ingredients, unless it shall appear to the Department of Agriculture that the manufacturer of said fertilizer in question has, in the manufacture of other goods offered in this State during such season, employed such ingredients as are outlawed by the provisions of this article, or unless it shall appear to the Department of Agriculture that the manufacturer of such fertilizer has offered for sale during that season any kind of dishonest or fraudulent goods; but nothing in this article shall impair the right of contract." C. S., Vol. II, sec. 4697. This statute was passed in 1917 and slightly amended in 1919 as to the method of drawing samples, and the statute expressly provides that "Nothing in this article shall impair the right of contract." Acting under the provisions of this statute, the plaintiff and defendant entered into the contract set out above.
After stating the material facts: It will be observed that the contract provides that "The certificate of analysis by the State Chemist, or his oral evidence, shall be the best and only competent evidence of the contents of the goods, and shall be conclusive." The certificate shows affirmatively that the contents of the goods are phosphoric acid 8.80, nitrogen 1.65, and potash 1.96, and that they do not contain borax. The parties have agreed that the analysis by the State Chemist should be the best and only competent evidence of the contents of the goods, and conclusive; and it would seem that the evidence which the defendant proposed to offer to show that the goods contained borax or, in other words, the contents of the goods were different from that shown by the analysis, was clearly incompetent.
A chemical analysis by a disinterested competent expert, such as the State Chemist, is the best method of ascertaining the contents of fertilizers, and infinitely better than the method proposed by the defendant. *Page 280 
"The best evidence is the analysis by the Agricultural Department," saidClark, C. J., in Fertilizer Works v. McLawhorn, 158 N.C. 274. In Carterv. McGill, 168 N.C. 507, the Court said: "The seller and the buyer of fertilizers can protect themselves by a proper warranty at the time of purchase if they see fit to do so. The seller may restrict it, while the buyer may require that it be enlarged, according as their interest may dictate. Unless they do so, they must abide by the contract as made by them." This was said in a case where the seller had not protected himself, as in the case at bar.
When Carter v. McGill, supra, was before the Court on a rehearing, reported in 171 N.C. 775, the Court said: "It is proper, in this connection, to suggest that the plaintiff, and others in the fertilizer trade similarly situated, can protect themselves against too great a hazard in respect to the loss of crops by a provision in their contracts to the effect that they are not to be liable for any results from the use of the fertilizer, or for any loss of crops, as was done in the case of the contract which was the subject of the controversy between the parties inGuano Co. v. Livestock Co., 168 N.C. 442, where we held such a stipulation to be valid."
Our attention has been called to a case recently decided in South Carolina, Germofert v. Cathcart, 88 S.E. 535, in which, upon careful examination, we find the Court construed a contract almost identical in language with the one which was under consideration in Guano Co. v.Livestock Co., 168 N.C. 442, and it held, as we did in the latter case, that the express warranty, and the restrictive clause therein as to nonliability for results, excluded the evidence as to failure of crops. See, also, Allen v. Young, 62 Ga. 617, which was cited for that position in Guano Co. v. Livestock Co., supra, at p. 448. In the Germofert case,supra, the Court said that "the defendant cannot be allowed to avail himself of a method of defense that he has agreed not to use." And again, "the defendant had agreed not to `hold payee responsible for practical results of said fertilizer on crops.' The evidence and the charge responding to it was in direct violation of the agreement." And so we said substantially in Guano Co. v. Livestock Co., supra, the rule of damages having been fixed by the terms of the contract itself.
While cases must be decided according to the rules of law, as well stated by Justice Hoke in Tomlinson v. Morgan, 166 N.C. 557, the strict enforcement of the rule may in some cases bear harshly upon a litigant, and it might do so in this class of cases. It is therefore expedient and proper that the dealer should be allowed to shield himself against possible injustice by adequate provision in the contract of sale. If he acts in good faith, he should not be unfairly dealt with; and it is not unusual, as the cases will show, to insert such a clause in contracts *Page 281 
of this kind. In Guano Co. v. Livestock Co., 168 N.C. 442, the contract provided that "the fertilizer is furnished with the guarantee of analysis printed on the sack, but not of results from its use," and the Court held this was a valid stipulation and that the guano company could not be held liable for any results from the use of the fertilizer, and the jury could consider the evidence as to the effect of the fertilizer on the crops only for the purpose of showing the absence of the guaranteed ingredients or the represented quantities of each, and not at all for the purpose of assessing damages either directly or indirectly, because of any loss or diminution of the crops, as the measure of damages depends upon quite a different principle. The extent of the recovery must be restricted to the difference, not necessarily between the price and the value of the article purchased, but to the difference between the article delivered under the contract of warranty and its value or market price if it had been such as it was warranted to be. The Court then said: "We have mentioned this subject for the purpose of showing that no part of the recovery, under this contract, should be assessed for the failure of crops, as there is an express stipulation that plaintiff should not be held liable for any results from the use of the fertilizer." Guano Co. v. Livestock Co., supra, at pp. 450-1. This was said in a case where the stipulation was that the fertilizer company only guaranteed the analysis on the bags, and was not liable for results from use, but there was no stipulation, as in the case at bar, that the analysis should be the best, only, and conclusive evidence as to the contents of the goods. Nor was there a provision that when the goods were analyzed the State Chemist should determine the relative value of the guaranteed ingredients and those found on analysis, as in this case, The State Chemist did analyze the goods and found that those delivered exceeded in value the guaranteed goods sold by $1.15 per ton.
The recent case of Fertilizer Works v. Aiken, 175 N.C. 398, seems to be decisive of this case. There the earlier cases are reviewed, and the Court held that where an express warranty guaranteeing a specified analysis, but not as to results on the crops, will protect the manufacturer or vendor from damages claimed for loss or diminution of crops, because the goods were not fitted for the purposes for which they were bought, this being a warranty ordinarily implied in such contracts, citing Carter v.McGill, 168 N.C. 507 (S. c., 171 N.C. 775); Guano Co. v. Livestock Co.,168 N.C. 443; Germofert v. Cathcart, 104 S.C. 125; Allen v. Young,62 Ga. 617.
In the Aiken case, the fertilizer company sued for the fertilizers sold under a contract in the following terms: "I hereby acknowledge I have received and used the above fertilizers, without any guarantee on the part of Armour Fertilizer Works or its agents as to results from its use, *Page 282 
and which have been inspected, tagged and branded under and in accordance with the laws of this State; and I hereby waive all claims, damages, and penalties in case of deficiency, except claim for the actual commercial value of deficiency when, and only when, ascertained and determined by the State Chemist from samples taken in the presence of seller or seller's authorized representative, from fertilizers for which this note is given." The defendant alleged in his answer that the fertilizer was utterly worthless. In referring to the contract, this Court said: "In this contract it will be noted that the stipulations in protection of the vendor go much beyond those appearing in the case just referred to. (168 N.C. 443.) In its terms and purpose it is broad enough to exclude, and does exclude, any and all evidence as to the effect of the fertilizer on the crops, the agreement being as shown, that the purchaser waives all claims except those for the `commercial value of the deficiency' from the stipulated standard, and this only when ascertained and determined by the State Chemist from samples taken from the fertilizers sold and in the presence of the seller or his authorized agent. We are of opinion that such a stipulation is in every way a reasonable one, well calculated to promote and insure fair and safe dealing with this important matter, and not only not opposed to any public policy prevailing with us, but the same is in accord with direct suggestion of this Court in Carter v. McGill, supra, and fully recognized and approved in our latest legislation on the subject, Laws 1917, ch. 143."
The contract in this case is, in its terms, very similar to the one in the Aiken case. It provides, among other things: "If any claim shall be made for inferiority or deficient analysis, the certificate of analysis by the State Chemist shall be the best and only competent evidence of the contents of the goods, and shall be conclusive. If it shall appear from the said certificate that the goods do not come up to the guaranteed analysis, then the customer shall be entitled to receive the difference between the contract price and the actual value of the goods as shown by the analysis, which difference shall be ascertained by the State Chemist, and no other damage shall be recoverable for deficient analysis or inferiority."
The Court, referring to the statute which had just been passed, Laws 1917, ch. 143 (now C. S., 4690 to 4703, as amended in 1919, as to method of sampling), said: "The statute in question, repealing sections 3945 to 3956 of Revisal, inclusive, makes elaborate and minute provision with the view of insuring a correct analysis of these important commodities and in protection both of the manufacturer and vendor and of the purchaser and consumer; directs the employment of sufficient chemists and assistants; provides for an analysis at the instance of the *Page 283 
purchaser, or by its own agents when necessary; provides further, that samples for the purpose shall be taken always in the presence of the agent, seller, or dealer, or some representative of the manufacturers, or if none of these can be present, or if they refuse to act, then in the presence of two disinterested witnesses, etc. That no suit for damages shall be brought for results in use except after chemical analysis showing deficiency of ingredients unless the dealer has been selling goods that are outlawed by the statute, or had offered for sale during the season dishonest or fraudulent goods. Having thus dealt very fully with the subject, recognizing as sound the principle of selecting the samples in the presence of the manufacturer or dealer, section 7 of the act concludes with the proviso that `nothing in said act shall impair the right of contract,' showing the clear intent and purpose of the Legislature to allow to either party the privilege of making further stipulations in reasonable protection of their interests and in accord with established principles of law. InFertilizer Works v. McLawhorn, 158 N.C. 274, decided intimation is given that this is the true public policy and the correct interpretation of our former statute on the subject, and undoubtedly it should prevail under the present law." The Court further said, with reference to that language, that it was much stronger for the protection of the manufacturer than is that used in the case of Guano Co. v. Livestock Co., supra, and we now say that the language of the contract in this case is, if anything, much more restrictive of the customer's right to question the truth and accuracy of the statements contained in the official (and also in this case contractual) analysis of the State Chemist. The parties were free to enter into a contract with regard to the matter, and to bind, and even conclude, themselves, and each one of them, by its stipulations. They made for themselves in their dealings a contractual rule of evidence, each being at arms-length with the other, there was nothing in it contrary to public policy, and therefore they must be held as subject to its terms, and their rights and obligations must be determined accordingly.
But the defendant contends that there was fraud, in that the plaintiff had mixed borax with the other ingredients of the fertilizer, and his crops were damaged thereby, as it was the opinion of his expert witness, who was a botanist, that borax was injurious to the crops, and their appearance indicated symptoms showing that they had been poisoned by borax. But the full and complete answer to all of this contention is that it has been shown by the analysis of the State Chemist (the party to whom the law, and the parties by their contract, referred the matter for a final decision, which should bind them "conclusively") that there was no borax in the fertilizer. There is no allegation or suggestion that there was any fraud practiced by the chemist in making *Page 284 
his decision or award, or even by the plaintiff in preventing an honest report, but, on the contrary, and as far as appears, the certificate of the analysis was fairly and honestly made, without even any hint at fraud of collusion. We do not say that fraud would not be sufficient to set aside a false certificate of the facts as to the value and potency of the fertilizer, but it has not been shown in this case, or attempted to be shown. The defendant himself requested the State Chemist to make the analysis, and, besides, he solemnly agreed that it should bind and conclude him. If he had any doubt of its correctness, or even if he did not have such doubt, and wished to be assured of its correctness, he could then have retained another chemist of his own choice and possessing greater skill and expertness, if he thus appraised him. In the absence of such a showing of fraud, the certificate must stand as conclusive evidence that the analysis is correct. It certainly cannot be impeached by the opinion even of an expert botanist that the appearance of the crop indicated symptoms of borax poisoning. If we should hold otherwise, it would impair very seriously the efficacy of the statute, and annul the contract of the parties, the execution of which is not assailed for fraud.
There is no sufficient evidence of fraud for the jury. The most that can be said in behalf of defendant's position is that the opinion of the botanist formed by a mere inspection of the crop as to the presence of borax in the fertilizer is too uncertain, conjectural, and unreliable to be received as proof, and can hardly be of the least probative force if admitted, when considered in the light of the statute and the stipulations of the parties, by which it has been excluded, as unfit for the purpose of establishing the alleged fact of fraud. It has been agreed, and the law so declares, that the only evidence shall be the certificate of the analysis as made by the State Chemist, and that shows "conclusively" that there was no borax in the formula by which the fertilizer was made. The report of the analysis by the chemist, both impliedly and expressly, declares that there was no borax or other deleterious substance in the fertilizer, and, as we have said, there is nothing to impeach that finding for fraud or other reason, therefore the opinion of the botanist must be discarded. If we should admit such evidence, instead of the certificate being an absolute protection for the manufacturer or dealer in fertilizers, as we have said it was intended to be by the law and the contract, it would be little more than a delusion and a snare.
In the case of Germofert Mfg. Co. v. Cathcart, 88 S.E. (S.C.), 535, the Court passes upon this very question in the following language: "There was no attempt made to analyze the fertilizer. Ample provision is made by law to secure a reliable analysis. The defendant had agreed that the test of value should be made by analysis. No man can *Page 285 
look at a crop (dead or alive) and tell what per cent of ammonia or potash or other substance it contained. They did not pretend to do so. The defendant had agreed not to `hold payees responsible for practical results of said fertilizer on crops.' This evidence, and the charge responding to it, was in direct violation of the agreement. It cannot be said that test of value by analysis is an unlawful contract, because the statutes recognize a test by analysis. The defendant signed a perfectly lawful contract, with ample protection afforded by law. The defendant cannot refuse to adopt the protection approved by law and offered by his contract and be allowed to avail himself of a method of defense that he has agreed not to use. Some substances may kill because they are true to analysis." There was a dissenting opinion in the case, but we most respectfully think that it completely missed the real question in that case, and is based entirely upon a misconception of the point involved. The majority opinion stated the point and the pertinent principle correctly, placing the decision upon the clause discharging the seller from all responsibility for "results upon the crops."
We must hold, therefore, that there is no reason shown why the judgment of the Superior Court should be disturbed.
No error.